UNITED STATES of America ex rel.
George SIMS, Petitioner-Appellee,

v.

Allyn SIELAFF, Director, Illinois Department of Corrections, and David Brierton, Warden, Stateville Correctional Center, Respondents-Appellants.

No. 76–2070.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1977.

Decided Aug. 31, 1977.

Rehearing and Rehearing En Banc
Denied Oct. 6, 1977.

William J. Scott, Atty. Gen., Melbourne A. Noel, Jr., Asst. Atty. Gen., Chicago, Ill., for respondents-appellants.

Thomas Peters, Chicago, Ill., for petitioner-appellee.

Before FAIRCHILD, Chief Judge, and PELL and TONE, Circuit Judges.

PELL, Circuit Judge.

The question before us in this habeas corpus case is whether the State of Illinois denied petitioner Sims due process when it revoked his parole.

## I

In 1959, Sims was convicted by an Illinois court of murder, and was sentenced to 199 years in prison. On December 15, 1972, he was released on parole.

On February 2, 1975, Sims, under suspicion of having committed two rapes and an assault, was stopped by the Jacksonville, Illinois, police while he was driving his automobile. He was then arrested on charges of driving while under the influence of alcohol and illegally transporting liquor in a motor vehicle. Subsequently, Sims' parole officer issued a parole violation warrant and Sims, waiving a preliminary hearing on the parole violation question, was returned to prison. Sims was never indicted or convicted on any of these charges.[1]

■ On April 22, 1975, Sims' parole was revoked after a revocation hearing that in no way complied with the minimum due process requirements articulated in *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).[2] The Parole Board failed to advise Sims of the evidence against him, denied him the opportunity to confront and cross-examine adverse witnesses, and never provided a written statement of the evidence relied on and the reasons for revoking parole. Each of these was clearly and specifically required by *Morrissey. Id.* at 489, 92 S.Ct. 2593. Moreover, although our record does not contain whatever police reports and other documents were before the Board, it is apparent that unsupported allegations of the suspected rapes and the assault reached and influenced the Board, notwithstanding the Board's refusal formally to base revocation on those incidents and its later statements that the revocation was based on the DWI and illegal transportation charges.[3] Finally, even as to those latter charges, absolutely no evidence was adduced at the hearing to support a finding under any evidentiary standard that Sims had committed the offenses and thus violated his parole agreement.[4] *See Vachon v. New Hampshire*, 414 U.S. 478, 480, 94 S.Ct. 664, 38 L.Ed.2d 666 (1974) (per curiam). Sims was the only witness who testified, and while he admitted driving *after having been drinking*, he flatly denied having driven *while intoxicated* and likewise denied that the flask found in his car had contained any liquor at the time of his arrest.[5]

1. The only formal charge brought, on the illegal transportation matter, was dismissed on motion of the State's Attorney.

2. The State conceded as much on oral argument here.

3. In its oral conclusions of April 22, 1975, the Board per member Doheny, devoted one of the slightly more than two pages of the transcribed conclusions to describing the alleged rape and assault incidents and how the victims had declined to prosecute. Noting the lack of prosecution, Sims' outright denial of these charges, and the lack of witnesses to contradict him, it was then stated that "the Board, *while it believes the story*, does not feel that it should be made a part of the finding." [Emphasis added.] Mr. Doheny continued as follows:

   The Board also notes that the crime of murder, for which the man is here, was one which also contained a rape, and the record shows that the man was alleged to have been involved in two other rapes prior to receiving the sentence of [sic] murder.

   If all the facts reported are true, then we have an individual who has been involved in at least five rapes over a period of time . . . .

Only three lines of the transcribed conclusions relate to the DWI and transportation charges.

4. *Gagnon v. Scarpelli*, 411 U.S. 778, 783 n. 5, 93 S.Ct. 1756, 1760, 36 L.Ed.2d 656 (1973), makes it clear that *Morrissey, supra*, does not "prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence." The only live testimony substitutes to which reference is made in our record were some police reports; perhaps there were others. No doubt some of this material tended to inculpate Sims, at least in the Board members' minds. But we do not think that apparently unsworn documents never disclosed to the parolee and not even made a part of our record by appellant State officials can speculatively be used to establish the existence of evidence supporting the Board's findings, and we do not understand the State to argue otherwise.

5. He admitted having used the flask for liquor at a previous date, but did not admit that he illegally transported it in a motor vehicle even then. That specific question was not put to him.

The State attempts to explain the inadequacies of the April 22 hearing by arguing that the Parole Board is a non-judicial body composed of non-lawyers and that the Board in this case made an inadvertent but good faith misinterpretation of Sims' testimony as containing admissions of the DWI and transportation charges. In a case where the parole violation is admitted, the State argues, not unpersuasively, see *Morrissey, supra,* 408 U.S. at 490, 92 S.Ct. 2593, less process is due the parolee. Sims, on the other hand, asserts that the "highly educated and sophisticated members of the Board" must have realized the distinction between having a drink and being intoxicated, denies that the constitutional errors were or could have been inadvertent, and suggests that the Board knowingly, egregiously, and intentionally violated his rights.[6] The district court did not resolve this characterization conflict with a factual finding, and we are not able to do so on this record. We do note, however, that it is surely conceivable that a body of laymen, pressed with the need to deal with numerous parolees daily and making decisions, so far as appears, without benefit of a transcript could have, in good faith, made the erroneous interpretation of Sims' testimony that apparently was made here. We also point out, on the other hand, that the good faith nature of the Board's mistake does not change the constitutional fact that Sims' parole was revoked without due process.

On July 29, 1975, Reverend William Johnson, the Director of the Ministry of Criminal Justice of the Northern Illinois Conference of the United Methodist Church, dispatched a three-page letter with documentary attachments to the Board, requesting a rehearing on the revocation decision. By letter of September 5, 1975, the Board denied the request "after a thorough review of Mr. Sims' entire file," noting that "[t]he record discloses that the parole revocation was based upon an admission by Mr. Sims" that he committed the DWI and transportation offenses. By letter of even date, the Board advised a "711 Attorney"[7] at the Prisoners Legal Assistance office, two of whose attorneys continue to represent Sims, that rehearing had been denied. Our record provides no indication of the precise nature of the attorney's prior contacts with the Board, but the Board's letter states that Sims' "admission" as to the DWI and transportation charges constituted the "factual information relied upon by the Parole Board," apparently in response to a query along those lines.[8] Thus, the Board's attention was twice directed to Sims' case between the end of July and early September, 1975, and after a "thorough review" of the case records, the Board continued to insist upon its position that Sims had admitted the pertinent offenses.

In February 1976, Sims filed a petition for habeas corpus in the district court. Only thereafter did the Board decide to grant a rehearing. On April 22, 1976, a revocation rehearing was held, at which Sims was represented by counsel and numerous witnesses were called. The earlier revocation decision was affirmed. The district court did not need to consider whether or not the procedural requirements of *Morrissey, supra,* were met in the second hearing,[9] because it concluded that *Morrissey's*

6. At oral argument, counsel for Sims conceded that this latter suggestion, to some extent at least, was representative of the "brief writer's hyperbole" syndrome.

7. Illinois Supreme Court Rule 711 allows qualified and supervised senior law students to practice law, subject to limitations.

8. The State's argument here that no authorized rehearing petition was presented to them in the summer of 1975 is thus twice negatived. First, the Board's rules appear to permit petitions to be made by persons other than the prisoner or his counsel, *Rules and Regulations of the Pa-*

*role and Pardon Board Governing Parole,* Rule 4(G), and the Board plainly treated and responded to Reverend Johnson's letter as such a petition. Second, the Board advised Sims' authorized counsel that rehearing had already been denied, which advice can only be interpreted as referring to the Johnson letter.

9. The district court did, however, note that the second hearing, unlike the first, did adduce sufficient evidence of Sims' parole violations to support the Board's finding thereof, with which conclusion we agree.

guarantee of a reasonably prompt revocation hearing, 408 U.S. at 488, 92 S.Ct. 2593, was violated here. Relying on this court's decisions in *United States ex rel. Hahn v. Revis*, 520 F.2d 632 (7th Cir. 1975);[10] and *Johnson v. Holley*, 528 F.2d 116 (7th Cir. 1975), the district court determined that the nine-month delay between the July 1975 rehearing petition and the April 1976 hearing was unreasonable, and that prejudice therefrom must be presumed as a matter of law. Accordingly, on September 24, 1976, the district court granted the writ of habeas corpus. The State appealed.

## II

■ An element of the fair process due a parolee facing revocation is that "[t]he revocation hearing must be tendered within a reasonable time after the parolee is taken into custody." *Morrissey, supra*, 408 U.S. at 488, 92 S.Ct. at 2603–04. Sims' first revocation hearing was held less than three months after he was taken into custody and no contention has been made that this delay violated due process. On the other hand, as the first hearing did not comport with the then well-known requirements of due process, it would not ordinarily serve to stop the clock on the obligation to give Sims a fair hearing. We do not think, nonetheless, that the promptness of the first hearing should be totally disregarded. If the revocation decision was made in good faith on the basis of an inadvertent error, that would provide a neutral reason explaining that part of the delay (prior to the second hearing) which occurred before July 29, 1975, when the Board's attention was redirected to the *Sims* case and a rehearing was requested. July 29 is all the more a significant date in this case, because, coincidentally, this court's decision in *United States ex rel. Hahn v. Revis, supra*, which referred to the delay issue, was issued on July 25, 1975. In *Johnson v. Holley, supra*, it was held that *Hahn's* teachings should not be applied retroactively. *Hahn*, involving a federal parolee rather than a state parolee, first ap-

peared in a bound volume of the Federal Reporter (2d) bearing a 1976 printing date. Further, we note that even if a habeas action had been filed by Sims fairly promptly after the first revocation hearing, the normal progress of litigation is such that by the time of appellate disposition, if that had directed a due process hearing by the Board, the calendar time of the rehearing might well have been later than the date of the rehearing actually afforded by the Board.

In *Hahn*, this court held that a federal parolee serving time on a state sentence based on conduct occurring during his parole, against whom a federal parole violation warrant had been lodged with the state prison authorities, had a right to a reasonably prompt disposition of the parole violation charge. (The Supreme Court has abrogated this aspect of *Hahn*. *Moody v. Daggett*, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976). *See* discussion *infra*.) In *Hahn*, a petitioner who had not received a revocation hearing in the more than two years following his state court conviction was ordered released from the restraint of the violation warrant. In a footnote pertinent to a parolee's right to have a revocation hearing within a reasonable time after a criminal conviction established a parole violation, the court stated:

> A reasonable time *would appear to be* no longer than the length of time delay is presently sanctioned between the time a violation warrant is executed and a revocation hearing is held. As a general rule, three months *appears to be* the maximum delay tolerated. *Marchand v. Director, U. S. Probation Office*, 421 F.2d 331, 335 n.5 (1st Cir. 1970) and authorities cited therein. [Emphasis added.]

520 F.2d at 638 n.5.

In *Johnson v. Holley, supra*, a federal parolee was indicted for certain crimes committed in Kentucky while he was on parole, and a violation warrant based on those

---

**10.** This court subsequently recalled its mandate in *Hahn* to await the decision in *Moody v. Daggett*, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d

236 (1976); a modified opinion in *Hahn* has recently been released, 560 F.2d 264 (7th Cir. 1977).

charges and unlawful flight to Canada was issued. The parolee upon deportation from Canada was taken briefly into federal custody and then turned over to Kentucky authorities. Seven months later, the Kentucky charges were dismissed without prejudice and the parolee was returned to federal custody. Ten more months ensued before a revocation hearing was held, but the Government argued that delays subsequent to June 1973 were attributable to the parolee. This court remanded for consideration of the reasons for the entire delay and a determination as to the delay's reasonableness. Relying solely on *Hahn*, the following statements were made in the court's opinion:

It should be noted with respect to the four-month delay from the time petitioner was returned to federal custody until June 1973 that unless some substantial part of that delay is attributable to petitioner, that delay alone was unreasonable. [Citing the *Hahn* footnote quoted above.]

Under the *Hahn* decision, if there was an unreasonable delay in holding the hearing, prejudice is presumed and petitioner is entitled to discharge on the parole violation charge.

528 F.2d at 119. Although the court then declined to apply the *Hahn* standard retroactively, it was *Johnson's* ratification of that rule upon which the district court in the present case primarily relied in granting the writ.

■ After the district court granted the writ, the Supreme Court decided *Moody v. Daggett, supra,* in which it was held that a federal parolee imprisoned for a crime committed while on parole has no due process right to a prompt revocation hearing prior to being taken into custody on a violation warrant. If, as in that case, a parole board chooses to defer the hearing until the parolee's release from custody on the conviction, the parolee has no constitutional ground for complaint, because his "present confinement and consequent liberty loss derives not in any sense from the outstanding parole violator warrant, but from his . .

[intervening] convictions." 429 U.S. at 86, 97 S.Ct. at 278. Although in *Moody* the federal parolee was serving a federal sentence, the logic applies equally without regard to which sovereign has convicted and imprisoned the parolee, *Head v. United States Board of Parole,* 553 F.2d 22 (7th Cir. 1977), *cert. denied,* —— U.S. ——, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977). *Moody,* then, plainly abrogated *Hahn's* holding.

We think it clear that *Moody* does not directly *control* this present case, for two important reasons. First, and most obviously, the linchpin of the *Moody* rationale is that no process is due a parolee facing revocation until his life, liberty, or property interests are impaired by the revocation proceeding. Sims, in contrast to Moody, was taken into custody and then imprisoned solely pursuant to that proceeding, and his due process rights were therefore activated.

Second, in *Moody* and in all cases like it, the fact of a parole violation is conclusively established by a criminal conviction arising out of conduct while on parole. *Morrissey, supra,* 408 U.S. at 490, 92 S.Ct. 2593; *Moody, supra,* 429 U.S. at 89, 97 S.Ct. 274, 279. In such cases, "the only remaining inquiry is whether continued release is justified notwithstanding the violation." *Id.* As the *Moody* opinion points out, this uniquely predictive determination is substantially aided by the availability of the parolee's institutional record. Moreover, without the benefit of that record, a prompt decision in which a criminal conviction would be the most recent input would often produce a foreordained result of revocation. Where, as here, a parole violation has neither been admitted nor established by conviction, these considerations do not apply. This is a constitutionally significant difference. *See, e. g., Gagnon v. Scarpelli, supra,* where the Supreme Court, notwithstanding *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), held that an indigent's right to appointed counsel in revocation proceedings should be determined on a case-by-case basis, but noted that "[p]resumptively" counsel should be provided where the parolee makes a colorable

claim "that he has not committed the alleged violation of the conditions upon which he is at liberty." 411 U.S. at 790, 93 S.Ct. at 1764. The State, in fact, necessarily albeit implicitly recognizes the force of this distinction in its argument that the procedural inadequacies of Sims' first revocation hearing were justified by the Board's good faith but mistaken belief that Sims had admitted the violation.

While we do not believe *Moody controls* this case, we cannot avoid the recognition that it impacts upon the language in *Hahn* and the rule affirmed in *Johnson*. The premise of the *Hahn-Johnson* rule was that a dispositional delay of more than three months was so unfair that prejudice had to be presumed, with habeas release a virtually automatic result. *Moody* casts doubt on that premise by authorizing dispositional delays of several or more years.[11] To be sure, the technical basis of the *Moody* holding is, as Sims argues, that *Moody's* due process rights had not yet ripened. But if a dispositional delay in excess of three months properly produces a presumption that the ultimate revocation hearing will not be fair because of intervening prejudice to the parolee, then the *Moody* decision can only be viewed as an exercise in semantics, for as soon as the due process rights of one in Moody's position ripen he will be entitled automatically to have the parole violator warrant quashed. We do not interpret *Moody* to stand only for a victory of form over substance; besides our understandable reluctance so to characterize a decision of our highest Court, we also have in *Moody* a vigorous dissent to assure us that the point was not overlooked.

■ The fact that in *Moody,* unlike this case, there was no need to reestablish at the revocation hearing the fact of parole violation does, as we have said, distinguish the

two cases, but it reduces in our opinion *Moody's* impact on the *Hahn-Johnson* presumed prejudice—automatic release rule only minimally.[12] For even the discretionary and predictive determination as to whether a violation justifies revocation is subject to due process requirements:

> The parolee must have an opportunity to . . . show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation.

*Morrissey, supra,* 408 U.S. at 488, 92 S.Ct. at 2603. A rule that several months of dispositional delay produces a presumption of prejudice would no doubt have to be applied to the mitigation question as well as the violation question, at least in some cases.[13] The Supreme Court in *Moody* was not insensitive to the possibility of prejudice to a parolee's mitigation "defense," but it treated the question in a manner inconsistent with a presumed prejudice rule. The petitioner in *Moody* had argued that evidence of mitigation might be lost if the revocation hearing was postponed until after his sentences ran. The Court responded to the argument by noting that no claim was made that there was additional evidence which might be vitiated by delay, and that the Parole Commission had the power to avoid any such problems, if a proper claim was made, by holding an immediate evidence preservation hearing. 429 U.S. at 88 n. 9, 97 S.Ct. 274.

■ *Moody,* then, by its logic and its implications, if not by its holding, seriously undercuts any due process notion to be found in *Hahn* and *Johnson* that a presumption of prejudice requiring habeas relief arises from a prehearing delay in excess of three months. Moreover, as the State argues, such a presumption is basically incon-

---

**11.** The habeas petitioner in *Moody, e. g.,* was incarcerated on two ten-year concurrent sentences.

**12.** In *Hahn* parole violation was conceded and only mitigation was involved.

**13.** The *Moody* majority's reasoning that a prompt hearing might often, where criminal

convictions are in issue, produce a foreordained result of revocation, *see* discussion *supra,* is surely more persuasive in a case like *Moody,* where two homicide convictions were involved, than it would be where a conviction was for a relatively minor offense and strong mitigation evidence was tendered.

sistent with the standards applied to test a criminal defendant's claim that he has been denied a speedy trial. Just like a parolee facing a revocation hearing, a criminal defendant may (because of denial of bail or inability to make bail) spend his pretrial time incarcerated; similarly, both a parolee and a criminal defendant may prove to be innocent of the charges which occasion the proceedings. Yet as *Barker v. Wingo,* 407 U.S. 514, 523, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), makes clear, a state criminal defendant invoking his constitutional due process right to a speedy trial [14] may not rely on any specified period of delay as creating a presumption of prejudice and requiring his release. Instead, such a claim must be tested on a case-by-case basis, upon consideration of the length of and reason(s) for the delay, the defendant's assertion of the right, and prejudice to the defendant. *Id.* at 530, 92 S.Ct. 2182.

■ A rule that treats a due process claim by a parolee facing revocation more favorably than a similar claim by an unconvicted criminal defendant reverses the analytic positions of the two claimants. For "one who is a  .  .  .  parolee only because he has been convicted of a crime" has a "more limited due process right" than does an accused. *Gagnon v. Scarpelli, supra,* 411 U.S. at 789, 93 S.Ct. at 1763 (footnote omitted); *see also Morrissey, supra,* 408 U.S. at 489, 92 S.Ct. 2593. This does not mean, of course, that a parolee's right *to a prompt hearing* is to be judged more stingily than an accused's right to a speedy trial, but it surely does cut against a rule that would achieve the converse result.

■ Accordingly, we hold that a parolee's claim that the delay preceding his final revocation hearing violates due process, when that hearing otherwise (here, arguably) comported with due process, must be judged by the standards suggested by *Barker v. Wingo, supra,* and cases following it.[15]

The district court's reliance here on *Hahn* and *Johnson* made it unnecessary for the court to determine whether Sims' second hearing satisfied due process requirements other than with respect to the delay issue. Sims has advanced, both in the district court and in this court, numerous arguments to the effect that the second hearing did not do so. We think this issue should be decided in the first instance by the district court which may or may not require additional evidence to make that decision. In addition to the generally applicable standards, the court will have to decide whether, in the second revocation proceeding, the Board relied on information outside the record or revoked petitioner's parole on the basis of unproved charges of misconduct other than the before-related offenses. If it did, due process was denied. If the court determines that the second hearing complied with due process, then it will be necessary to determine whether due process was denied by the delay, under the appropriate standards.

■ We have intentionally phrased our holding on this point narrowly, because the district court may find that Sims' second hearing, leaving the delay issue aside, did accord the process that was due. If that is found to be the case, the situation will be closely analogous to an accused's speedy trial claim, in that the constitutional delay error, if any, must be assessed after the delay has ended. In such circumstances, the error cannot be cured by subsequent proceedings, and the "unsatisfactorily severe remedy of dismissal of the indictment," *Barker, supra,* 407 U.S. at 522, 92 S.Ct. at 2188, or quashing the violation warrant in parole cases, is yet "the only possible remedy." *Id.; accord, Strunk v. United States,* 412 U.S. 434, 440, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973).

■ This is very strong medicine, for it means that a guilty person, or one who has

---

14. Or, of course, a federal defendant invoking directly his explicit Sixth Amendment right to a speedy trial would be similarly situated.

15. *Cf. United States v. Companion,* 545 F.2d 308, 310–12 (2d Cir. 1976), applying *Barker* analysis to a federal probationer's statutory right to be taken before the appropriate district court "[a]s speedily as possible after arrest."

been fairly determined to have violated his parole, must go entirely free. This fact has properly induced a hesitant approach by the federal courts to declaring post hoc, pretrial delays to have violated speedy trial rights. For example, although each of the factors set out in *Barker* are always necessarily considered, substantial emphasis is often placed on the existence of prejudice to the accused or parolee. Moreover, although cognizable prejudice includes "oppressive pretrial incarceration" and "anxiety and concern of the accused" as well as "the possibility that the defense will be impaired," *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193 (footnote omitted), primary attention is frequently focused, where absolute release with dismissal of charges is the only available remedy, on defense impairment, the "most serious" component of prejudice. *Id. See United States v. Jackson,* 542 F.2d 403, 408–09 (7th Cir. 1976).

[11] The district court's order granting the writ of habeas corpus is, for the reasons set out herein, reversed, and the case is remanded for further proceedings consistent with this opinion.[16]

Reversed and Remanded.

TONE, Circuit Judge, concurring. I join in Judge Pell's opinion but wish to add a few words.

It is true, as Chief Judge Fairchild points out in his dissent, that in *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), the custody during the period of the delay was held not to be unlawful because it resulted from conviction of other crimes, not the parole violation warrant. But it also is clear from that case that a delay of more than 90 days in holding a parole revocation hearing is not in and of itself so inherently unfair as to amount to a violation of constitutional right. That proposition is consistent with *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), for if an inflexible presumption of prejudice resulting automatically in unconditional release is not necessary to enforce the explicit speedy trial command of the Sixth Amendment, it seems to me that it cannot be said that it is necessary to enforce the prompt hearing requirement of *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Accordingly, even when the basis for the custody is the parole violation warrant, as it is here, its lawfulness should be determined by the criteria prescribed in *Barker v. Wingo.*

That result does not mean that a prisoner held under a parole revocation warrant is without a remedy for a threatened or actual deprivation of the right to a prompt hearing. First, like an indicted defendant awaiting trial, he can demand a prompt hearing. Second, by filing a petition for habeas corpus he can force the parole authorities to hold a prompt hearing, failing which he can obtain his release. If he has been prejudiced by an unnecessary delay in holding the hearing, he will be entitled to relief. If he has not been prejudiced, and it turns out as a result of the hearing that the commencement and duration of custody have not been affected by the delay, the custody will ordinarily be lawful and release pursuant to a petition for habeas corpus inappropriate. These are the reasons, I believe, that have led other circuits, and led this circuit before *Hahn,* to deny relief when the Board had held a proper hearing before the court ruled on the habeas corpus petition and no prejudice was shown.

---

**16.** Our record reflects that in the more than two years appellee was paroled he was employed and supported his family, with whom he lived. He then spent, as we have noted, over one and one-half years incarcerated as a parole violator before the district court ordered his release, since which time (nearly a year) he has again been at large. We cannot ignore the possibility that to reincarcerate appellee pending the district court's disposition of this cause, which quite conceivably could result once again in his release, would create undue hardship for him and his family. Accordingly, appellee is to remain free on his own recognizance until the district court has the opportunity to consider this possibility. That court will then have discretion to order appellee's reincarceration or to leave him free on recognizance pending decision of the issues on remand. *See United States ex rel. Hahn v. Revis* (as modified), *supra.*

*Weaver v. Markley,* 332 F.2d 34 (7th Cir. 1964); *United States ex rel. Blassingame v. Gengler,* 502 F.2d 1388 (2d Cir. 1974), adhering to *United States ex rel. Buono v. Kenton,* 287 F.2d 534 (2d Cir. 1961), *cert. denied* 368 U.S. 846, 82 S.Ct. 75, 7 L.Ed.2d 44 (1961); *Gaddy v. Michael,* 519 F.2d 669 (4th Cir. 1975), *cert. denied,* 429 U.S. 998, 97 S.Ct. 524, 50 L.Ed.2d 608 (1976); *Cotner v. United States,* 409 F.2d 853, 857 (10th Cir. 1969); compare *Heezen v. Daggett,* 442 F.2d 1002, 1004 (8th Cir. 1971) with *Cleveland v. Ciccone,* 517 F.2d 1082, 1089 (8th Cir. 1975).

FAIRCHILD, Chief Judge, dissenting.

The majority opinion relies heavily on the recent Supreme Court decision in *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), and concludes that, if in that case, involving the government's refusal to execute a parole violation warrant until after an individual had served a sentence for a crime committed while on parole, the Court was willing to tolerate a delay of possibly ten years in the ultimate hearing on parole revocation, it necessarily follows that mere delay in any parole violation case will not support a denial of due process claim. I cannot agree. For me there is a critical difference between (1) a state unreasonably delaying nine months in affording an individual, not otherwise incarcerated, a parole revocation hearing, as in the instant case, and (2) a state waiting —admittedly, sometimes years—while an individual completes a different sentence before deciding whether to revoke parole for a prior offense. The difference is that, in the latter case, though the individual is incarcerated, he suffers no liberty loss directly attributable to the state's delay. In the former, however, if the facts, when they are adjudged, do not support revocation, the individual will have suffered a substantial loss of liberty[1] precisely as a result of the state's inaction. The majority may be correct that in terms of physical

evidence, witnesses' memories, etc., a hearing held after nine months is no less "fair" than a hearing after ten years. But I do not find that relevant to assessing Sims' due process claim. In *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Supreme Court explained that it is the scope of the liberty interest at stake that must be considered in determining what due process safeguards are required in any circumstance. *Id.* at 481–84, 92 S.Ct. 2593. Thus, in determining when a state's delay in affording a parole revocation hearing constitutes a denial of due process, I look to when that inaction begins directly to jeopardize the individual's liberty. If an individual is going to spend the next ten years in prison regardless of what action is taken during that time on an outstanding parole violation warrant, it may be very well to say that a ten-year delay in the warrant's execution does not violate due process. But if the only reason an individual spends nine months in jail is the state's failure to afford an adequate parole revocation hearing, I find nothing in the *Moody* decision which requires this court to depart from its previous rulings that any delay in excess of three months is basically unfair and a violation of due process. *See United States ex rel. Hahn v. Revis,* 520 F.2d 632, 638, n. 5 (7th Cir. 1975); *Johnson v. Holley,* 528 F.2d 116, 118–19 (7th Cir. 1975). *See also Marchand v. Director, U. S. Probation Office,* 421 F.2d 331, 335, n. 5 (1st Cir. 1970). I would affirm the district court order granting *habeas corpus.*

1. In *Morrissey v. Brewer,* 408 U.S. 471, 481–82, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the Supreme Court makes clear that though parolees enjoy a more circumscribed liberty than aver- age citizens, they nevertheless possess the "core values of unqualified liberty," such that revocation of parole must comport with due process.